# UNITED STATES DISTRICT COURT
## DISTRICT OF IDAHO

| | |
|---|---|
| RHINO METALS, INC., an Idaho corporation,<br><br>    Plaintiff,<br><br>vs.<br><br>KODIAK SAFE COMPANY, LLC, a California limited liability company,<br><br>    Defendant. | Case No.: 1:16-285-EJL-REB<br><br>**REPORT AND RECOMMENDATION RE:**<br><br>**DEFENDANT'S MOTION TO DISMISS**<br>**(Docket No. 6)**<br><br>**PLAINTIFF'S MOTION FOR PRELIMINARY INJUNCTION**<br>**(Docket No. 5)**<br><br>**MEMORANDUM DECISION AND ORDER RE:**<br><br>**PLAINTIFF'S MOTION FOR LEAVE TO FILE UNDER SEAL**<br>**(Docket No. 31)** |

Now pending before the Court are: (1) Defendant's Motion to Dismiss (Docket No. 6),

(2) Plaintiff's Motion for Preliminary Injunction (Docket No. 5), and (3) Plaintiff's Motion for

Leave to File Under Seal (Docket No. 31). Having carefully considered the record, participated

in oral argument, and otherwise being fully advised, the undersigned enters the following Report

and Recommendation as to the first two motions, and a Memorandum Decision and Order as to

the third motion:

## I.  RELEVANT BACKGROUND

The parties are in dispute over Defendant Kodiak Safe Company, LLC's ("KSC") use of

Plaintiff Rhino Metals, Inc.'s ("Rhino") registered trademark KODIAK® in the production of

gun safes – Rhino brings this action against KSC for federal trademark infringement and false

**REPORT AND RECOMMENDATION / DECISION AND ORDER - 1**

designation of origin under the Lanham Act.  The relevant facts, drawn largely from Rhino's

Complaint and the parties' briefing on the at-issue Motions, include:

1.      Rhino is in the business of manufacturing and selling metal gun safes, toolboxes,

and the like.  *See* Compl., ¶ 2 (Docket No. 1).  Rhino is an Idaho corporation.  *See id.* at ¶ 1.

KSC is a manufacturer and distributor of custom guns and luxury safes, including gun safes sold

under the KODIAK brand.  *See* Opp. to Mot. for Prelim. Inj., p. 2 (Docket No. 12).  KSC is a

California company.  *See* Compl., ¶ 3 (Docket No. 1).

2.      KSC claims that, since 1981, it has been "continuously and exclusively" selling

gun safes under the KODIAK brand/mark.  *See* Opp. to Mot. for Prelim. Inj., p. 2 (Docket No.

12) ("In sum, the business of selling safes under the KODIAK mark and through the Kodiak

Trade Names has been continuous and ongoing since Kodiak's predecessors established it in

1981.").

3.      Sometime in 2012, KSC began creating a website, acquiring the domain name

*kodiaksafes.com*.  *See id.* at p. 3.  Until being "published" in August 2015, KSC's website

consisted of, simply, KSC's contact information and a "Website Coming Soon!" page, with no

user interactivity or ability to order products online.  *See id.*; *see also* Compl., ¶¶ 24 (Docket No.

1).  According to KSC, this "Website Coming Soon!" page was accessible from at least as early

as June 11, 2013.  *See* Opp. to Mot. for Prelim. Inj., p. 3 (Docket No. 12).

4.      On July 25, 2014, Rhino filed a federal trademark application for KODIAK with

the U.S. Patent & Trademark Office.  *See* Compl., ¶ 13 (Docket No. 1).  Rhino claims that, at the

time of this filing, KSC was not readily identifiable in a simple Google® search for "Kodiak

Safes."  *See id.* at ¶ 14.  KSC disputes Rhino's characterization of its internet presence as of July

2014.  *See, e.g.*, Ex. C to DiBuduo Decl. (Docket No. 11, Att. 1).

**REPORT AND RECOMMENDATION / DECISION AND ORDER - 2**

5.     On December 16, 2014, the U.S. Patent & Trademark Office published Rhino's KODIAK mark for opposition, permitting any party that believes it may be damaged by registration of the mark to oppose registration.  *See id*. at ¶ 16.  No oppositions were filed.  *See id*.  Rhino began using the KODIAK mark in connection with its metal safes in December 2014.  *See id*. at ¶ 10.  Following its initial use of the KODIAK mark, Rhino has prominently displayed, and continues to prominently display, the KODIAK mark in its marketing and promotional materials, and on its safe products.  *See id*. at ¶ 15.

6.     Rhino sold its first safe under the KODIAK mark in January 2015, and made its first delivery of the same in April 2015. *See* Mem. in Supp. of Mot. for Prelim. Inj., p. 6 (Docket No. 5, Att. 1).  Since then, Rhino has sold over 9,400 safes with the KODIAK mark throughout the United States and Canada.  *See id*.

7.     On April 23, 2015, KSC filed a federal trademark application for KODIAK with the U.S. Patent & Trademark Office.  *See* Compl., ¶ 19 (Docket No. 1).

8.     On or around May 13, 2015, Rhino received a letter from KSC, accusing Rhino of infringing its trademark rights to the name KODIAK.  *See id*. at ¶ 26; *see also* Opp. to Mot. for Prelim. Inj., p. 3 (Docket No. 12) ("On May 13, 2015, afer becoming aware of Rhino's infringing use of [KSC's] KODIAK mark through consumer confusion, [KSC] sent Rhino a letter outlining [KSC's] prior use of the KODIAK mark and demanding that Rhino immediately cease and desist from all further use of the same.  It is important to note that the May 13, 2015 letter was sent to Rhino only a few months after Rhino introduced its brand to the market and nearly 14 months before this action was filed.").

9.     On May 19, 2015, Rhino's trademark application for KODIAK issued as United States Trademark Registration No. 4,740,936.  *See* Compl., ¶ 17 (Docket No. 1).

**REPORT AND RECOMMENDATION / DECISION AND ORDER - 3**

10.     On or around May 22, 2015, Rhino responded to KSC's May 13, 2015 letter,

denying the latter's claims of infringement and noting that KSC had not made any efforts to

market its products using any "Kodiak" name outside of its place of business in Fresno,

California, either on the Internet or otherwise.  *See id.* at ¶ 29.

11.     On June 19, 2015, KSC's counsel claims to have sent (Rhino's counsel disputes

this) a follow-up email to Rhino's May 22, 2015 letter, providing additional information

regarding Kodiak's prior use of its trade name and the KODIAK mark that, according to KSC,

predated Rhino's registration.  *See* Opp. to Mot. for Prelim. Inj., p. 3 (Docket No. 12).  KSC's

counsel concluded the June 19, 2015 email with a request to further discuss the dispute.  *See id.*

at pp. 3-4 (citing Ex. C to DiBuduo Decl. (Docket No. 11, Att. 1) ("Please discuss this with your

client and let me know if perhaps we should set up a time to discuss this matter

telephonically.")).  According to KSC, Rhino never responded to its June 19, 2015 email.  *See*

Opp. to Mot. for Prelim. Inj., p. 4 (Docket No. 12).

12.     On July 10, 2015, KSC claims to have sent (again, Rhino's counsel disputes this)

a follow-up email to Rhino.  *See* Opp. to Mot. for Prelim. Inj., p. 4 (Docket No. 12) (citing Ex. D

to DiBuduo Decl. (Docket No. 11, Att. 1) ("I have not received a response to my email below.  I

kindly ask that you either provide a response or inform me that I should not be expecting one.")).

Again, according to KSC, Rhino never responded.  *See* Opp. to Mot. for Prelim. Inj., p. 4

(Docket No. 12).

13.     On August 5, 2015, the U.S. Patent & Trademark Office examiner issued an

office action rejecting KSC's April 23, 2015 trademark application "because of a likelihood of

confusion with the mark in U.S. Registration No. 4,740,936" (Rhino's KODIAK mark), finding

that the marks were "identical" and that the parties' products "travel in the same channels of

trade."  *See id.* at ¶ 20.  KSC did not file any response.  *See id.*

**REPORT AND RECOMMENDATION / DECISION AND ORDER - 4**

14.     Sometime in August 2015, KSC formally "published" its *kodiaksafes.com* website, ostensibly removing/revising the "Website Coming Soon!" page that had existed up until this point in time, to provide for user interactivity.  *See* Opp. to Mot. for Prelim. Inj., p. 3 (Docket No. 12); *see also id*. at p. 4 ("In August of 2015, after Rhino failed to respond to [KSC's] correspondence, [KSC] replaced its earlier website content by publishing its current website that it had been building since 2012."); Compl., ¶¶ 25, 34 (Docket No. 1) (Rhino alleging: "Upon information and belief, as of the registration date of Rhino's federal trademark registration for the KODIAK mark, KSC's only presence on the Internet consisted of the "Website Coming Soon" reference . . . .  Following Rhino's registration of the KODIAK mark with the USPTO as well as the parties May 2015 correspondence, KSC revised its [*kodiaksafes.com*] website to provide interactivity.").

a.      According to Rhino, "KSC now offers online sales from its website and will ship its Kodiak brand safes to any location in the United States.  KSC has also made its Kodiak brand safes available for purchase on Amazon.com.  Mem. in Supp. of Mot. for Prelim. Inj., p. 7 (Docket No. 5, Att. 1).

b.      KSC counters that, despite its website's apparent capabilities, it has never sold or shipped product to any individual or entity in the state of Idaho.  *See* Tanney Decl., ¶ 7 (Docket No. 6, Att. 2) ("[KSC] has never sold a safe (or any other product) to an Idaho resident or shipped a safe (or any other product) to an Idaho address, whether as a result of the website or otherwise. [KSC] makes no effort to sell products to, or target customers in, the State of Idaho. [KSC] conducts no marketing or advertising in the State of Idaho.").  Further, KSC contends that, through a "Google analytics inquiry," its website has received virtually no "hits" from

**REPORT AND RECOMMENDATION / DECISION AND ORDER - 5**

Idaho, save for those likely caused by Rhino and its counsel in the preparation of this action.  *See id*. at ¶ 10.

15.     On March 2, 2016, the U.S. Patent & Trademark Office issued a Notice of Abandonment of KSC's April 23, 2015 trademark application.  *See* Compl. at ¶ 21 (Docket No. 1).

16.     In May 2016, Rhino filed (but did not serve) a trademark infringement complaint against KSC in the U.S. District Court for the District of Utah (the "Utah action"), where Rhino's prior counsel was located.  *See* Mem. in Supp. of Mot. for Prelim. Inj., p. 8 (Docket No. 5, Att. 1).  Rhino voluntarily dismissed the Utah action and, on June 27, 2016, brought this action in this Court.  *See id*.  As to this Court's jurisdiction to entertain Rhino's claims against KSC, Rhino states in relevant part:

> KSC is subject to personal jurisdiction in this judicial district in that it has sufficient minium contacts with this judicial district, for reasons including but not limited to the fact that KSC has purposefully directed its actions at the forum state through the operation of an interactive website that advertises and markets products at issue in this action to residents of this judicial district; KSC's conduct has caused harm, and continues to cause harm, to Rhino in this judicial district; and the exercise of jurisdiction over KSC is reasonable under the circumstances.

Compl., ¶ 7 (Docket No. 1).

17.     On July 26, 2016, Rhino filed its Motion for Preliminary Injunction, requesting that this Court enter a preliminary injunction "[t]o preserve the *status quo ante litem* and to prevent KSC from benefitting in the marketplace during the time period in which the Court adjudicates Rhino's trademark infringement and other claims . . . ."  *Id*. at p. 4.

18.     On July 28, 2016, KSC moved to dismiss this action (or, alternatively, transfer this action to the United States District Court for the Eastern District of California), arguing that

**REPORT AND RECOMMENDATION / DECISION AND ORDER - 6**

it is not subject to personal jurisdiction in Idaho because it has no meaningful contacts with the forum state.  *See* Mem. in Supp. of Mot. to Dismiss, pp. 1-2 (Docket No. 6, Att. 1) ("[T]he mere fact that a defendant's interactive website is accessible in the forum state is insufficient to establish personal jurisdiction over the defendant in that state.").

19.     On August 19, 2016, KSC moved to stay this action to allow for the Court's consideration of its Motion to Dismiss before addressing Rhino's earlier-filed Motion for Preliminary Injunction.  *See* Mot. to Stay, p. 2 (Docket No. 10, Att. 1) ("[T]he Court cannot properly rule on Plaintiff's motion for injunctive relief unless it has personal jurisdiction over [KSC]. [KSC] therefore requests that the Court stay its decision on Plaintiff's motion for preliminary injunction until resolution of Kodiak's motion to dismiss.").

20.     On October 21, 2016, the undersigned[1] (1) permitted the parties to engage in discovery related only to the jurisdictional issues raised in KSC's Motion to Dismiss; (2) allowed the parties to thereafter submit supplemental briefing related to their respective positions on KSC's Motion to Dismiss; (3) indicated that the Court would set a hearing on KSC's Motion to Dismiss and Rhino's Motion for Preliminary Injunction once the parties' anticipated briefing was received; and (4) denied KSC's Motion to Stay as moot.  *See* Order, pp. 1-2 (Docket No. 24).

21.     On December 12, 2016, the Court heard oral argument on KSC's Motion to Dismiss and Rhino's Motion for Preliminary Injunction.

---

[1]  The matter was originally assigned to the undersigned U.S. Magistrate Judge.  *See* Notice (Docket No. 8).  The matter was reassigned to U.S. District Judge Edward J. Lodge on August 23, 2016 and, on September 21, 2016, Judge Lodge referred all matters to the undersigned.  *See* Orders (Docket Nos. 17 & 23).

**REPORT AND RECOMMENDATION / DECISION AND ORDER - 7**

## II.  REPORT/DISCUSSION

**A.     KSC's Motion to Dismiss (Docket No. 6)**

1.     Personal Jurisdiction: Legal Standard

FRCP 12(b)(2) allows a party to assert lack of personal jurisdiction as a defense by motion.  *See* Fed. R. Civ. P. 12(b)(2).  "Although the defendant is the moving party on a motion to dismiss [for lack of personal jurisdiction], the plaintiff bears the burden of establishing that jurisdiction exists."  *Rio Props., Inc. v. Rio Int'l Interlink*, 284 F.3d 1007, 1019 (9th Cir. 2002); *see also Boschetto v. Hansin*, 539 F.3d 1011, 1015 (9th Cir. 2008).  Where, as here, the defendant's motion to dismiss is based on written materials rather than an evidentiary hearing, "the plaintiff need only make 'a prima facie showing of jurisdictional facts to withstand the motion to dismiss.'"  *Brayton Purcell LLP v. Recordon & Recordon*, 606 F.3d 1124, 1127 (9th Cir. 2010) (quoting *Pebble Beach Co. v. Caddy*, 453 F.3d 1151, 1154 (9th Cir. 2006)). Generally, the court may consider the pleadings as well as any declarations submitted by the parties when deciding a motion to dismiss for lack of personal jurisdiction.  *See Data Disc. Inc. v. Systems Tech. Assocs., Inc.*, 557 F.2d 1280, 1285 (9th Cir. 1977).  The plaintiff cannot "simply rest on the bare allegations of its complaint."  *Schwarzenegger v. Fred Martin Motor Co.*, 374 F.3d 797, 800 (9th Cir. 2004).  However, "uncontroverted allegations in [the plaintiff's] complaint must be taken as true, and conflicts between the facts contained in the parties' affidavits must be resolved in [the plaintiff's] favor."  *Rio Props.*, 284 F.3d at 1019.  In other words, "for the purpose of this [prima facie] demonstration, the court resolves all disputed facts in favor of the plaintiff."  *Pebble Beach*, 453 F.3d at 1154.

"In evaluating the appropriateness of personal jurisdiction over a nonresident defendant, [courts] ordinarily examine whether such jurisdiction satisfies the 'requirements of the

**REPORT AND RECOMMENDATION / DECISION AND ORDER - 8**

applicable state long-arm statute' and 'comport[s] with federal due process.'" *Bauman v.*

*Daimler Chrysler Corp.*, 644 F.3d 909, 919 (9th Cir. 2011) (alteration in original) (quoting *Chan*

*v. Soc'y Expeditions, Inc.*, 39 F.3d 1398, 1404-05 (9th Cir. 1994)).  The Ninth Circuit has

recognized that the Idaho Legislature intended to exercise all of the jurisdiction available under

the Due Process Clause.  *See Lake v. Lake*, 817 F.2d 1416, 1420 (9th Cir. 1987).  Thus, resolution

depends upon the issue of due process.  *See Pebble Beach*, 453 F.3d at 1155.  "For due process

to be satisfied, a defendant, if not present in the forum, must have 'minimum contacts' with the

forum state such that the assertion of jurisdiction 'does not offend traditional notions of fair play

and substantial justice.'" *Id.* (quoting *Int'l Shoe Co. v. State of Wash., Office of Unemp't Comp.*

*& Placement*, 326 U.S. 310, 316 (1945)).

　　　"Applying the 'minimum contacts' analysis, a court may obtain either general or specific

jurisdiction over a defendant."  *Doe v. Unocal Corp.*, 248 F.3d 915, 923 (9th Cir. 2001).  "If the

defendant's activities in the forum are substantial, continuous and systematic, general

jurisdiction is available; in other words, the foreign defendant is subject to suit even on matters

unrelated to his or her contacts to the forum."  *Id*.  On the other hand, "[a] court may exercise

specific jurisdiction over a foreign defendant if his or her less substantial contacts with the forum

give rise to the cause of action before the court."  *Id*.  The Ninth Circuit applies a three-part test

to determine whether a district court can exercise specific personal jurisdiction over a

nonresident defendant:

> (1) The nonresident defendant must purposefully direct his activities or consummate
> some transaction with the forum or resident thereof; or perform some act by which
> he purposefully avails himself of the privilege of conducting activities in the forum,
> thereby invoking the benefits and protections of its laws;
>
> (2) the claim must be one which arises out of or relates to the defendant's forum-
> related activities; and

**REPORT AND RECOMMENDATION / DECISION AND ORDER - 9**

(3) the exercise of jurisdiction must comport with fair play and substantial justice, i.e. it must be reasonable.

*Schwarzenegger*, 374 F.3d at 802 (quoting *Lake v. Lake*, 817 F.2d 1416, 1421 (9th Cir. 1987)).

"The plaintiff bears the burden of satisfying the first two prongs of the test." *Id*.  "If the plaintiff

succeeds in satisfying both of the first two prongs, the burden then shifts to the defendant to

'present a compelling case' that the exercise of jurisdiction would not be reasonable."  *Id*.

(quoting *Burger King Corp. v. Rudzewicz*, 471 U.S. 462, 477 (1985)).  Where a court is

exercising specific jurisdiction over a defendant, "the fair warning that due process requires

arises not at the time of the suit, but when the events that gave rise to the suit occurred."  *Steel v.*

*United States*, 813 F.2d 1545, 1549 (9th Cir. 1987).

       2.    <u>This Court May Exercise Specific Jurisdiction Over KSC</u>

       KSC argues that Rhino fails to allege facts establishing either general or specific

jurisdiction over it.  *See generally* Mem. in Supp. of Mot. to Dismiss (Docket No. 6, Att. 1).  In

its opposition (and confirmed during oral argument), Rhino argues only that this Court has

specific jurisdiction over KSC.  For the following reasons, it is recommended that this Court

exercise specific jurisdiction over KSC.

       a.    *Purposeful Direction*

       The first requirement for specific jurisdiction is purposeful availment or direction.  *See*

*Schwarzenegger*, 374 F.3d at 802.  The phrase "purposeful availment" includes both purposeful

availment and purposeful direction, which are distinct concepts.  *See Schwarzenegger*, 374 F.3d

at 802.  While a purposeful availment analysis is used in suits sounding in contract, a purposeful

direction analysis is used in suits sounding in tort.  *See id*.  Misappropriation of a trademark is an

**REPORT AND RECOMMENDATION / DECISION AND ORDER - 10**

intentional tort and, as a result, tracks the purposeful direction analysis. *See Nissan Motor Co. v. Nissan Computer Corp.*, 246 F.3d 675, 675 (9ᵗʰ Cir. 2000) (applying purposeful direction analysis to trademark infringement lawsuit); *see also Precision Craft Log Structures, Inc. v. Cabin Kit Co., Inc.*, 2006 WL 538819 (D. Idaho 2006).

Purposeful direction is evaluated under the three-part "effects" test drawn from *Calder v. Jones*, 465 U.S. 783 (1984).  The Ninth Circuit described *Calder* and its three-part test as follows:

> *Calder* stands for the proposition that purposeful availment[/direction] is satisfied even by a defendant "whose only 'contact' with the forum state is the 'purposeful direction' of a foreign act having effect in the forum state." . . . [Under] *Calder*, the "effects" test requires that the defendant allegedly have (1) committed an intentional act, (2) expressly aimed at the forum state, (3) causing harm that the defendant knows is likely to be suffered in the forum state.

*Schwarzenegger*, 374 F.3d at 803 (quoting *Dole Food Co. v. Watts*, 303 F.3d 1104, 1111 (9ᵗʰ Cir. 2002)); *see also Panavision Intern., L.P. v. Toeppen*, 141 F.3d 1316, 1320 (9ᵗʰ Cir. 1998) ("It is not required that a defendant be physically present or have physical contacts with the forum, so long as his efforts are 'purposefully directed' toward forum residents."); *Yahoo! Inc. v. La Ligue Contre Le Racisme*, 433 F.3d 1199, 1206 (9ᵗʰ Cir. 2006) (purposeful direction analysis focuses on "the forum in which the defendant's actions were felt, whether or not the actions themselves occurred within the forum.").  Keeping in mind that not every "foreign act with foreseeable effects" in the forum state will support a finding of specific jurisdiction, KSC's alleged conduct will be contrasted against the *Calder* "effects" test to determine the appropriateness of finding specific jurisdiction here, in Idaho Federal District Court.  *Dole*, 303 F.3d at 1112.

### i.   Intentional Act

The word "act" "denote[s] an external manifestation of the actor's will and does not include any of its results, even the most direct, immediate, and intended." *Schwarzenegger*, 374

F.3d at 806 (quoting *Restatement (Second) of Torts* § 2).  The Ninth Circuit therefore "construe[s] 'intent' in the context of the 'intentional act' test as referring to an intent to perform an actual, physical act in the real world, rather than an intent to accomplish a result or consequence of that act."  *Id*; *see also Washington Shoe Co. v. A-Z Sporting Goods, Inc.*, 704 F.3d 668, 674 (9th Cir. 2012) ("[A]n intentional act is an external manifestation of the actor's intent to perform an actual, physical act in the real world, not including any of its actual or intended results.").

Here, Rhino argues that KSC engaged in the requisite intentional act by virtue of its infringing product line and website to purchase those same products.  *See* Obj. to Mot. to Dismiss, pp. 5-6 (Docket No. 15) ("KSC's operation of its website on which it is selling 'Kodiak' gun safes and willfully infringing Rhino's KODIAK® mark satisfies the intentional act requirement.  The sale and distribution of products that infringe a trademark is an intentional act. The operation of a website, even a passive website, is also an intentional act.").  To be clear, creating allegedly infringing website content constitutes an intentional act.  *See Mavrix Photo, Inc. v. Brand Tech., Inc.*, 647 F.3d 1218, 1229 (9th Cir. 2011) (finding intentional act where defendant reposted allegedly infringing photographs on website); *Brayton Purcell LLP*, 606 F.3d at 1128 (finding that the "'intentional act' element is easily satisfied" where defendant "created" and posted elder law section on its website that infringed [plaintiff's] copyright.").  Accordingly, Rhino satisfies the first prong of the "purposeful direction" test.

### ii.    Expressly Aimed at the Forum State

In general, express aiming requires more than "'untargeted negligence' that merely happened to cause harm to [a plaintiff]."  *Schwarzenegger*, 374 F.3d at 807 (quoting *Calder*, 465

**REPORT AND RECOMMENDATION / DECISION AND ORDER - 12**

U.S. at 789); *see also Washington Shoe*, 704 F.3d at 675 (inquiry requires "something more" than "a foreign act with foreseeable effects in the forum state" and that "'something more' is what the Supreme Court described as 'express aiming' at the forum state.") (quoting *Bancroft & Masters, Inc. v. Augusta Nat'l Inc.*, 223 F.3d 1082, 1087 (9th Cir. 2000)).  For instance, the delivery or consumption of products in the forum state that are "'random,'" "'fortuitous,'" or "'attenuated'" does not satisfy the express aiming analysis.  *Mavrix,* 647 F.3d at 1230 (9th Cir. 2011) (quoting *Burger King Corp. v. Rudzewicz*, 471 U.S. 462, 486 (1985)).  Among other factors, "[t]he requirement is satisfied 'when the defendant is alleged to have engaged in wrongful conduct targeted at a plaintiff whom the defendant knows to be a resident of the forum state.'" *Menken v. Emm*, 503 F.3d 1050, 1059 (9th Cir. 2007) (quoting *Dole*, 303 F.3d at 1111); *see also Bancroft & Masters*, 223 F.3d at 1087 (9th Cir. 2000) (concluding that "'express aiming' encompasses wrongful conduct individually targeting known forum resident").

"The 'express aiming' analysis depends, to a significant degree, on the specific type of tort or other wrongful conduct at issue." *Schwarzenegger*, 374 F.3d at 807.  For example, in *Calder*, the intentional acts of writing and editing an allegedly libelous article in Florida were nonetheless "expressly aimed" at California because petitioners (newspapermen) "*knew* [the article] would have a potentially devastating impact upon respondent [(a professional actress)]" who petitioners knew lived and worked in California.  *See Calder*, 465 U.S. at 789-90 (emphasis added).  In other words, "the respective directions of the intentional act and the known impact need not coincide for the 'express aiming' requirement to be satisfied." *Washington Shoe*, 704 F.3d at 675 (noting further that, "[p]articularly in the case of a willful copyright infringement, the intentional act constituting the violation may occur solely within one state while the *known* impact of that copyright infringement is directed at another state.").  Instead, an allegation of a

**REPORT AND RECOMMENDATION / DECISION AND ORDER - 13**

willful act of infringement by a party with knowledge of both the existence of the intellectual

property right and the forum of that right's holder, may demonstrate the necessary

"individualized targeting" to satisfy *Calder's* "express aiming" requirement.  *See, e.g.*, *id*. at

678-79; *see also Amini Innovation Corp. v. JS Imps., Inc.*, 497 F. Supp. 2d 1093, 1105 (C.D. Cal.

2007) ("[S]pecific jurisdiction exists where a plaintiff files suit in its home state against an out-

of-state defendant and alleges that defendant intentionally infringed its intellectual property

rights knowing [the plaintiff] was located in the forum state.").

     *Washington Shoe* paints such a picture.  There, the plaintiff was a Washington-based

shoe manufacturer with a traveling salesman who occasionally sold products to the Arkansas

defendant, a sporting goods store.  *See id*. at 670-71.  As it turned out, the defendant sold

infringing "knock-offs" of the plaintiff's products in its Arkansas store, which caused the

plaintiff to send a cease-and-desist letter from its Washington headquarters.  *See id*. at 671.

When the alleged infringing sales continued, the plaintiff sued the defendant in Washington.  *See*

*id*.  The United States District Court for the Western District of Washington dismissed the action

for lack of personal jurisdiction.  *See id*.  The Ninth Circuit, however, reversed, concluding that

the defendant's infringing sales were "expressly aimed at the state of Washington, where [the

defendant] has its headquarters and from which it controls its exclusive rights in its copyright."

*Id*. at 678.  Specifically, the Ninth Circuit reasoned:

> Because the harm caused by an infringement of the copyright laws must be felt at
> least at the place where the copyright is held, we think that the impact of a willful
> infringement is necessarily directed there as well. . . .  When copyrights are held by
> corporations, the "right to control the work" will typically be exercised where the
> corporation is located.  The impact of an intentional violation of that right is
> necessarily directed at that location. . . .  A-Z's intentional acts were expressly aimed
> at the copyright held by Washington Shoe because A-Z *knew* that its intentional acts
> would impact Washington Shoe's copyright by virtue of the cease-and-desist letters

**REPORT AND RECOMMENDATION / DECISION AND ORDER - 14**

it had received.  Where A-Z knew or should have known that Washington Shoe is a Washington company, A-Z's intentional acts were expressly aimed at the state of Washington.  When the infringer intentionally interferes with the holder's copyright, he strikes at the heart of the rights conferred by the Copyright Act, the holder's right to control his copyright on his own terms.  We think that A-Z's alleged willful infringement of Washington Shoe's copyright, and its knowledge of both the existence of the copyright and the forum of the copyright holder, is sufficient "individualized targeting" to establish the "something more" necessary to satisfy the express aiming requirement.

*Id.* (internal citations omitted) (emphasis in original).[2]

*Washington Shoe's* rationale controls the outcome here.  To begin, if this action involved only the existence of Rhino's claimed mark on KSC's website, there likely would be no specific

---

[2] This concept of individualized targeting in an intellectual property context – including instances where alleged infringement occurs over a commercial website – is reflected elsewhere within the Ninth Circuit.  *See, e.g.*, *Cirana Corp. v. Changshu Jisheng Spinning*, 2016 WL 5890061, *6 (C.D. Cal. 2016) ("Here, plaintiff is the copyright holder, is located in California, and alleges willful copyright infringement.  Accordingly, the Court concludes that the Unlimited defendants' intentional acts were expressly aimed at California.") (internal citations omitted); *Fighter's Market, Inc. v. Champion Courage LLC*, 2016 WL 4879437, *6-7 (S.D. Cal. 2016) (dismissing defendant's suit-related contacts with forum state argument, when "Plaintiff has established a prima facie case that Defendant intentionally infringed Plaintiff's trademarks, knowing that Plaintiff is a resident of this forum."); *Lindora, LLC v. Isagenix Int'l, LLC*, 2016 WL 4077712, *6 (S.D. Cal. 2016) ("There is an additional basis on which the express aiming requirement is satisfied.  Lindora alleges that Isagenix continued using the Lindora Marks after Lindora sent a cease-and-desist letter to Isagenix On October 30, 2015 explaining that Lindora owned the marks. . . .  Thus, at the point Isagenix received the letter, Isagenix knew that Lindora owned the Lindora Marks, and that it controlled its trademark rights from California.  This knowledge is sufficient to turn what might otherwise have been general economic activity into 'individualized targeting' of Lindora."); *California Brewing Co. v. 3 Daughters Brewing LLC*, 2016 WL 1573399, *4 (E.D. Cal. 2016) ("The court finds these allegations of individualized targeting [(including the use of trademarked branding throughout the defendant's website and social media posts)] with knowledge of plaintiff's location sufficient to establish express aiming under Ninth Circuit precedent."); *Adobe Systems Inc. v. Blue Source Group, Inc.*, 125 F. Supp. 3d 945, 962 (N.D. Cal. 2015) ("Accordingly, Adobe makes a prima facie showing that Blue Source willfully infringed Adobe's copyrights and trademarks, knowing that Adobe was a resident of this District.  Under Ninth Circuit precedent, this is sufficient to satisfy the 'expressly aimed' inquiry."); *Amini*, 169 F. Supp. 3d at 1107 (finding purposeful direction test satisfied where defendants willfully infringed upon plaintiff's copyrights and plaintiff alleged that defendants "must have known it was located in California").

**REPORT AND RECOMMENDATION / DECISION AND ORDER - 15**

jurisdiction over KSC.  But it is KSC's conduct in August 2015 – when KSC purposefully

launched a commercial and interactive website advertising the sale of allegedly-infringing

products – that warrants a finding of personal jurisdiction here.  At that time, KSC knew that (1)

Rhino had registered the KODIAK mark, and (2) Rhino was located in Idaho; even so, it

intentionally proceeded to update its *kodiaksafes.com* website by removing the "Website Coming

Soon!" page that had existed up until that point in time, and replacing it with an altogether new,

interactive website offering to sell and ship KSC's allegedly-infringing products to any location

in the United States, including Idaho.[3]  This represents the "something more" that is required

when examining the issue of whether intentional conduct is expressly aimed at the forum state.

Rhino has alleged, and put forth evidence of, facts sufficient to establish that KSC's actions had

more than "mere" foreseeable effects in Idaho, and were in fact "expressly aimed" at the forum

state of Idaho.  Accordingly, Rhino satisfies the second prong of the "purposeful direction" test.[4]

---

[3]  That KSC may not have actually sold or shipped any product to any individual or entity in Idaho is immaterial in light of the claims asserted by Rhino against it – namely, trademark infringement.  That is, independent of any sales, the tort is complete upon the publication of an infringing mark/brand.  *See, e.g.*, *Adobe*, 125 F. Supp. 3d at 962 ("[T]he Court finds that Adobe's claim of personal jurisdiction does not hinge on Blue Source's sale of products into the forum state.  This is because Adobe establishes a prima facie case that Blue Source 'willfully infringed' Adobe's intellectual property rights and that Blue Source 'knew' Adobe 'had its principal place of business' in this District.  At this stage of the proceedings, this is sufficient to show express aiming.") (quoting *Washington Shoe*, 704 F.3d at 675-76).

[4]  KSC argues that *Washington Shoe's* application here is "improper and ineffective" in light of the United States Supreme Court's decision in *Walden v. Fiore*, 134 S.Ct. 1115 (2014).  *See* Reply in Supp. of Mot. to Dismiss, pp. 2-4 (Docket No. 21).  The undersigned acknowledges the potential tension *Walden* creates (unresolved by the Ninth Circuit to date), but disagrees with KSC insofar as it warranting the dismissal of this case.  In *Walden*, a Georgia police officer seized money belonging to two professional gamblers who were passing through Atlanta on a flight layover.  *See id.* at 1119.  The gamblers were residents of Nevada and California and sued the police officer in Nevada, alleging violations of their Fourth Amendment rights.  *See id.* at 1120.  The plaintiffs argued jurisdiction was proper in Nevada because the officer had committed

### iii. Causing Harm that the Defendant Knows is Likely to be Suffered in the Forum State

Where a party brings a claim for infringement of intellectual property, "[i]t is foreseeable that the loss will be inflicted both in the forum where the infringement took place . . . and where the [intellectual property right holder] has its principal place of business." *Washington Shoe*, 704 F.3d at 679; *see also Mavrix*, 647 F.3d at 1231 ("The economic loss caused by the intentional infringement of a plaintiff's copyright is foreseeable."). Here, Rhino is an Idaho corporation, and its principal place of business is in Idaho. KSC was aware of this, and knew at

---

an intentional act against a citizen of Nevada. *See id.* The Supreme Court found that the police officer had insufficient contacts with Nevada to subject him to jurisdiction there, explaining that "the plaintiff cannot be the only link between the defendant and the forum"; instead, it is "the defendant's suit-related conduct that must form the necessary connection with the forum state that is the basis for its jurisdiction over him." *See id.* at 1122 & 1126. However, the Supreme Court explicitly noted that it was not resolving the question of how "virtual contacts" applied to a personal jurisdiction inquiry. *See id.* at 1125, n.9 ("[T]his case does not present the very different questions whether and how a defendant's virtual "presence" and conduct translate into "contacts" with a particular State. To the contrary, there is no question where the conduct giving rise to this litigation took place: Petitioner seized physical cash from respondents in the Atlanta airport, and he later drafted and forwarded an affidavit in Georgia. We leave questions about virtual contacts for another day."). Additionally, the Supreme Court explicitly cited with approval its previous decision in *Calder*, the genesis of *Washington Shoe*. *See id.* at 1123-24. Here, this action is more *Calder* than *Walden*, given KSC's conduct in offering to sell an allegedly infringing product, knowing that Rhino owns the KODIAK mark and is based in Idaho. *See, e.g.*, *California Brewing*, 2016 WL 1573399 at *5 ("Specific jurisdiction over 3 Daughters and LM is not based on 'random, fortuitous, or attenuated' contacts defendants made with CBC, but rather on defendants' alleged conduct in marketing and selling an infringing product to California consumers with an alleged intent to directly compete with CBC. Accordingly, exercising personal jurisdiction over defendants in this action is not inconsistent with *Walden*.") (quoting *Burger King*, 417 U.S. at 475) (citing *Tresona Multimedia LLC v. Legg*, 2015 WL 470228, *4 (D. Ariz. 2015); *see also Blizzard Entm't, Inc. v. Bossland GmbH*, 2017 WL 412262, * 6 (C.D. Cal. 2017) (synthesizing *Walden* and *Calder*, finding that "Bossland has expressly aimed its conduct at the forum and that under the effects test, Bossland has purposefully directed its conduct at the United States."); *Mountz, Inc. v. Northeast Indus. Bolting and Torque, LLC*, 2016 WL 6699295, *4 (N.D. Cal. 2016) ("Unlike in *Walden*, Plaintiff's injury is 'tethered' to California: even if Plaintiff relocated to another forum, the potential confusion and deceit created by the infringing mark and Defendant's activities would still affect California residents – customers of both Defendant and Plaintiff.").

**REPORT AND RECOMMENDATION / DECISION AND ORDER - 17**

the time it allegedly infringed Rhino's trademark that Rhino held rights to the KODIAK mark; it therefore was foreseeable that Rhino would suffer harm in Idaho – by arguably going after Rhino's customers (owing to the interactive nature of KSC's website as of August 2015) and intentionally using  Rhino's known KODIAK mark, KSC also should have known that its conduct would cause Rhino harm in Idaho.  Accordingly, Rhino has satisfied the third prong of the "purposeful direction" test.

Because all three prongs of the purposeful direction inquiry have been met, the undersigned finds that the first requirement of specific jurisdiction is met as well.

### b.   Claim Arises From Forum-Related Activities

The Ninth Circuit adopted the "but for" test to determine the "arising out of" requirement.  *See Gray & Co. v. Firstenberg Mach. Co.*, 913 F.2d 758, 761 (9th Cir. 1990) (internal citation omitted).   "The Ninth Circuit has recognized that, in trademark or copyright infringement actions, if the defendant's infringing conduct harms the plaintiff in the forum, this element is satisfied."  *Adobe Sys.*, 125 F. Supp. 3d at 963.

Here, in the context of trademark infringement, Rhino alleges that it would not have been injured but for KSC's infringing conduct.  *See Compl.*, ¶ 43 (Docket No. 1) ("As a direct and proximate result of KSC's conduct, Rhino has suffered irreparable harm to the KODIAK Mark.  Unless KSC is restrained from further infringement of the KODIAK Mark, Rhino will continue to be irreparably harmed."); *see also id.* at ¶¶ 51, 61, & 68 (same).   Accordingly, Rhino sufficiently alleges that its claim arises out of KSC's forum-related activities, thus satisfying the second requirement of specific jurisdiction.  *See Panavision*, 141 F.3d at 1322 (concluding that plaintiff would not have been injured but for defendant's registration of plaintiff's trademarks as

**REPORT AND RECOMMENDATION / DECISION AND ORDER - 18**

his own domain names on the Internet, even though defendant's infringing acts occurred outside of the forum); *see also CollegeSource, Inc. v. AcademyOne, Inc.*, 653 F.3d 1066, 1079 (9th Cir. 2011) (trademark infringement claim "arises out of the action of [defendant]" where defendant allegedly infringed plaintiff's trademark, knowing that plaintiff was located in forum state).

   *c.*  *Reasonableness*

  Once a plaintiff has met its burden on the first two requirements of the specific jurisdiction inquiry, the burden shifts to the defendant to show why the exercise of jurisdiction would not be reasonable and fair. *See Schwarzenegger*, 374 F.3d at 802. Generally, a defendant must "'present a compelling case' that the exercise of jurisdiction would not be reasonable." *Id.* (quoting *Burger King*, 471 U.S. at 476-78).

  In determining whether the exercise of personal jurisdiction is reasonable, courts examine the seven factors outlined by the Ninth Circuit:

> the extent of purposeful interjection; the burden on the defendant to defend the suit in the chosen forum; the extent of conflict with the sovereignty of the defendant's state; the forum state's interest in the dispute; the most efficient forum for judicial resolution of the dispute; the importance of the chosen forum to the plaintiff's interest in convenient and effective relief; and the existence of an alternative forum.

*Shute v. Carnival Cruise Lines*, 897 F.2d 377, 386 (9th Cir. 1990). In turn, "court[s] must balance the[se] seven factors to determine whether the exercise of jurisdiction would be reasonable." *Id.* (citing *Federal Deposit Ins. Corp. v. British-American Ins. Co., Ltd.*, 828 F.2d 1439, 1442 (9th Cir. 1987)). In considering each of these factors, the undersigned determines that it is reasonable for this Court to exercise personal jurisdiction over KSC.

   **i.**  **Purposeful Interjection**

  "If a court determines that a defendant has purposefully directed its actions at the forum state, as discussed above, then the purposeful interjection factor favors the plaintiff" *Adidas Am.,*

**REPORT AND RECOMMENDATION / DECISION AND ORDER - 19**

*Inc. v. Cougar Sport, Inc.*, 2016 WL 1054581, *8 (D. Or. 2016) (citing *CollegeSource*, 653 F.3d at 1080).  The undersigned has determined that KSC purposefully directed its actions at Idaho. Accordingly, the first reasonableness factor favors jurisdiction.

### ii.        Burden on the Defendant

KSC argues that "it would be burdensome on the parties and inefficient for the Court to litigate in Idaho," emphasizing that it "has no witnesses, staff, agents, or employees in Idaho"; "[n]o documents related to [KSC's] business are located in Idaho"; and "none of [KSC's] products are located in Idaho."  Mem. in Supp. of Mot. to Dismiss, pp. 7-8 (Docket No. 6, Att. 1).  However, being located outside Idaho does not *ipso facto* represent an excessive geographic burden.  In the discovery process, it is common that information and documents are now exchanged electronically.  Additionally, though hearings on substantive motions are generally in-person affairs, it is not unusual for out-of-state parties to appear by telephone for efficiency and to contain costs (saying nothing of KSC already retaining local counsel).  Finally, as to the requirement for a company representative to appear at trial, there is no indication that he/she would necessarily be away from KSC for a longer period that genuinely would reach the level of burdensome,  if the trial took place in Idaho and, as a result, no indication that KSC, as a business, would suffer disproportionately.  Accordingly, even though there may well be inconvenience in having to defend against Rhino's claims in Idaho, the Court is not persuaded that having to do will rise to the level of an unreasonable burden.  *See Yahoo*, 433 F.3d at 1136 ("[W]hile the defendant's burden in litigating in the forum is considered, it will not be deemed unreasonable unless it constitutes a deprivation of due process."); *see also Panavision*, 141 F.3d at 1323 ("The burden on Toeppen as an individual living in Illinois to litigate in California is

**REPORT AND RECOMMENDATION / DECISION AND ORDER - 20**

significant, but the inconvenience is not so great as to deprive him of due process.").  The second

reasonableness factor is therefore either neutral or slightly favors jurisdiction.

### iii.       Conflict with the Sovereignty

The parties do not contend, nor does the Court perceive, any conflict between Idaho and

California regarding sovereignty.  Accordingly, the third reasonableness factor favors

jurisdiction.

### iv.       Idaho's Interest in the Dispute

"The Ninth Circuit assumes that a forum state 'maintains a strong interest in providing an

effective means of redress for its residents tortiously injured.'" *Id*. (quoting *Gordy v. Daily News,

L.P.*, 95 F.3d 829, 836 (9th Cir. 1996)).  Moreover, in addition to federal law claims, Rhino

asserts a claim under Idaho Code § 48-412.  Naturally, Idaho has an interest in adjudicating its

own laws.  *See Melaleuca, Inc. v. Hansen*, 2008 WL 2788470, *13 (D. Idaho 2008) (Judge

Williams agreeing with plaintiff in his Recommendation to Judge Lodge that Idaho has strong

interest in adjudicating dispute because "Idaho has enacted statutes to govern the claims alleged

in this case.").  Accordingly, the fourth reasonableness factor favors jurisdiction.

### v.       Most Efficient Forum

"In evaluating this factor, [the Ninth Circuit] ha[s] looked primarily at where the

witnesses and the evidence are likely to be located."  *Menken*, 503 F.3d at 1060-61 (internal

quotation marks omitted).  In claiming that California is a more efficient forum to resolve the

instant dispute, KSC argues (in addition to its above-referenced claimed burdens in having to

defend this action in Idaho) that, in contrast, Rhino "regularly does business in California and

has approximately 21 dealers in California" Mem. in Supp. of Mot. to Dismiss, p. 8 (Docket No.

**REPORT AND RECOMMENDATION / DECISION AND ORDER - 21**

6, Att. 1).  However, this argument fails to consider the specific evidentiary contours of this action and the witnesses relating to the circumstances giving rise to the claims asserted here.  In other words, beyond the claimed inconvenience to KSC generally, there is no evidence that California is the most efficient forum to oversee this action – in fact, the very opposite could well be the case, considering Rhino's state law claim.  Accordingly, the fifth reasonableness factor favors jurisdiction.

<strong>vi.      Importance of Chosen Forum to the Plaintiff</strong>

Rhino is located in Idaho; all of Rhino's employees are in Idaho; and all of Rhino's documents are located in Idaho.  Logically, then, Rhino prefers Idaho as the forum for its case against KSC.  Further, Rhino has asserted an Idaho state law claim in addition to its federal statutory claim.  It is important to Rhino in having a court in this forum consider its claims against KSC.  Accordingly, the sixth reasonableness factor favors jurisdiction.

<strong>vii.     Existence of an Alternative Forum</strong>

The Eastern District of California exists as an alternative forum.  However, "[w]hether another reasonable forum exists becomes an issue only when the forum state is shown to be unreasonable."  *CollegeSource*, 653 F.3d at 1080.  That is not the showing in this case.  Accordingly, the seventh reasonableness factor is either neutral or slightly favors jurisdiction.

Weighing these seven considerations calls for a finding of personal jurisdiction in this District.  That is, KSC has not presented a compelling case that the exercise of jurisdiction would be unreasonable.  Because this Court has specific jurisdiction over KSC, it is recommended that KSC's Motion to Dismiss (Docket No. 6) be denied.

**REPORT AND RECOMMENDATION / DECISION AND ORDER - 22**

3.      KSC's Alternative Request to Transfer the Action to the Eastern District of
        California is Not Supportable

A court may transfer an action to another district (1) for the convenience of the parties;

(2) for the convenience of the witnesses; and (3) in the interest of justice.  *See* 28 U.S.C.

§ 1404(a).  The Ninth Circuit requires courts to weigh multiple factors in determining whether to

transfer an action, including:

(1)     the location where the relevant agreements were negotiated and executed,

(2)     the state that is most familiar with the governing law,

(3)     the plaintiff's choice of forum,

(4)     the respective parties' contacts with the forum,

(5)     the contacts relating to the plaintiff's cause of action in the chosen forum,

(6)     the differences in the costs of litigation in the two forums,

(7)     the availability of compulsory process to compel attendance of unwilling
        non-party witnesses, and

(8)     the ease of access to sources of proof.

*Jones v. GNC Franchising, Inc.*, 211 F.3d 495, 498-99 (9th Cir. 2000).  "A defendant does not

satisfy the burden merely by showing preference for another forum or by shifting the

inconvenience to the other party."  *New Phase Dev., LLC v. Cook*, 2014 WL 4793845, *7 (D.

Idaho 2014) (citing *Van Dusen v. Barrack*, 376 U.S. 612, 645-46 (1964)).

 As described earlier in this decision, KSC argues that the Eastern District of California is

a more efficient and convenient forum.  In doing so, KSC now makes the same argument in

support of its efforts to transfer venue from this Court to the Eastern District of California:

        Considering these factors, the Eastern District of California is a more suitable venue
        for litigation than Idaho.  The Eastern District has general personal jurisdiction over

**REPORT AND RECOMMENDATION / DECISION AND ORDER - 23**

> Defendant because Defendant's principal place of business is in Fresno County, California.  Plaintiff has substantial contacts with California through its 21 dealers throughout the state, including the Eastern District.  In addition, Plaintiff's choice of forum is outweighed by the convenience of non-party witnesses, including Defendant's customers, nearly all of whom reside in California.  Moreover, Defendant stores all pertinent proof, including financial and business records at its principal place of business in Fresno, California.  Lastly, the difference in litigation costs and the relation of events to the chosen forum, are all unaffected by the proposed change in venue, given the nature of the dispute.

*See* Mem. in Supp. of Mot. to Dismiss, p. 9 (Docket No. 6, Att. 1).  The Court was not persuaded by such arguments in regard to the purposeful interjection factors, and they are no more persuasive in this context. Additionally, Idaho law governs a portion of this dispute (along with federal statutory claims), and there is no compelling reason to cede that decision to a court not located in Idaho.

Further, there is no evidence that litigating this case in California would be more cost-efficient.  Finally, "a defendant must make a strong showing to upset the deference accorded to the plaintiff's forum choice."  *New Phase*, 2014 WL 4793845 at *7 (citing *Decker Coal Co. v. Commonwealth Edison Co.*, 805 F.2d 834, 843 (9th Cir. 1986)).  Simply put, Rhino chose to file suit in Idaho, and the interests of justice are best served by an Idaho venue.  Based on the foregoing, KSC has not satisfied its burden, warranting a transfer of venue to the Eastern District of California under 28 U.S.C. § 1404(a).  Accordingly, KSC's alternative request to transfer venue should be denied.

**B.**    **Rhino's Motion for Preliminary Injunction (Docket No. 5)**

    1.    Preliminary Injunction:  Legal Standard

To obtain injunctive relief, a plaintiff must show: (1) a likelihood of success on the merits; (2) that irreparable harm is likely, not just possible, if the injunction is not granted; (3)

that the balance of equities tips in its favor; and (4) that an injunction is in the public interest. *See Winter v. Natural Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008).

In the Ninth Circuit, "serious questions going to the merits" and a balance of hardships that tips sharply in favor of the plaintiff can support issuance of a preliminary injunction if there is also a likelihood of irreparable injury and the injunction is in the public interest. *See Alliance for the Wild Rockies v. Cottrell*, 632 F.3d 1127, 1135 (9th Cir. 2011). This "sliding scale approach" allows a party to make a lesser showing of likelihood of success, provided it will suffer substantial harm in the absence of relief. *See id*. Under this approach, however, "serious questions going to the merits" requires more than "success is more likely than not" – it requires a plaintiff to demonstrate a "substantial case for relief on the merits." *See Wildearth Guardians v. Mark*, 2013 WL 6842771, *2 (D. Idaho 2013) (quoting *Leiva-Perez v. Hodler*, 640 F.3d 962, 967-68 (9th Cir. 2011)); *see also Northwest Envtl. Def. Ctr. v. United States Army Corps of Eng'rs*, 817 F. Supp. 2d 1290, 1302 (D. Or. 2011) ("'Serious questions' are those that are 'substantial, difficult and doubtful, and requiring a more thorough investigation.").

While courts are given considerable discretion in deciding whether a preliminary injunction should enter, injunctive relief is not obtained as a matter of right and it is considered to be an extraordinary remedy that should not be granted unless the movant, by a clear showing, carries the burden of persuasion. *See Sampson v. Murray*, 415 U.S. 61 (1974); *see also Stanley v. Univ. of S. California*, 13 F.3d 1313 (9th Cir. 1994). "In each case, a court must balance the competing claims of injury and must consider the effect on each party of the granting or withholding of the requested relief." *Amoco Prod. Co. v. Village of Gambell, Alaska*, 480 US. 531, 542 (1987).

**REPORT AND RECOMMENDATION / DECISION AND ORDER - 25**

Moreover, a preliminary injunction is not a preliminary adjudication on the merits, but a device for preserving the status quo and preventing the irreparable loss of rights before judgment.  *See Textile Unlimited, Inc. v. A..BMH Co., Inc.*, 240 F.3d 781, 786 (9th Cir. 2001) (citing *Sierra On-Line, Inc. v. Phoenix Software, Inc.*, 739 F.2d 1415, 1422 (9th Cir. 1984)). Further, the status quo  "is not simply any situation before the filing of the lawsuit, but rather the last uncontested status that preceded the parties' controversy."  *Dep't of Parks & Rec. v. Bazaar Del Mundo, Inc.*, 448 F.3d 1118, 1124 (9th Cir. 2006) (citing *GoTo.Com, Inc. v. Walt Disney co.*, 202 F.3d 1199, 1210 (9th Cir. 2000)).  *GoTo.Com* was a trademark infringement case, and relevant here the Ninth Circuit ruled that the relevant status quo in such a case was the time period that "existed before [the defendant] began using its allegedly infringing logo." *GoTo.Com*, 202 F.3d at 1210.

Here, Rhino seeks a preliminary injunction "enjoining KSC from selling, offering to sell, marketing, or advertising gun safes in any geographic region outside of the city of Fresno, California, including all Internet advertising directed at consumers outside of Fresno, California, during the pendency of the litigation."  Mem. in Supp. of Mot. for Prelim. Inj., p. 4 (Docket No. 5, Att. 1).

    2.    <u>A Preliminary Injunction is Warranted</u>

        *a.    Likelihood of Success on the Merits*

Proof of infringement requires that the trademark holder show that it is (1) the owner of a valid, protectable mark, and (2) that the alleged infringer is using a confusingly similar mark. *See Brookfied Commc'ns, Inc. v. W. Coast Entm't Corp.*, 174 F.3d 1036, 1046 (9th Cir. 1999).

**REPORT AND RECOMMENDATION / DECISION AND ORDER - 26**

###### i.      Owner of a Valid, Protectable Mark

"[T]he standard test of ownership is priority of use.  To acquire ownership of a trademark, it is not enough to have invented the mark first or even to have registered it first; the party claiming ownership must have been the first to actually use the mark in the sale of goods or services." *Sengoku Works Ltd. v. RMC Int'l, Ltd.*, 96 F.3d 1217, 1219 (9th Cir. 1996).  Federal registration of a trademark is prima facie evidence that the registrant is the owner of the mark. *See* 15 U.S.C. § 1057(b).  "Therefore, the registrant is granted a presumption of ownership, dating to the filing date of the application for federal registration, and the challenger must overcome this presumption by a preponderance of the evidence."  *Sengoku Works*, 96 F.3d at 1219.  "However, the non-registrant can rebut this presumption by showing that the registrant had not established valid ownership rights in the mark at the time of registration – in other words, if the non-registrant can show that he used the mark in commerce first, then the registration may be invalidated."  *Id*. at 1220.  "The first to use a mark is deemed the 'senior' user and has the right to enjoin 'junior' users from using confusingly similar marks in the same industry and market or within the senior user's natural zone of expansion."  *Brookfield Commc'ns, Inc. v. W. Coast Entm't Corp.*, 174 F.3d 1036, 1047 (9th Cir. 1999).

Here, Rhino rightly highlights that its KODIAK mark was registered by the U.S. Patent & Trademark Office on May 19, 2015 – prima facie evidence that it owns a valid and protectable mark "and has the exclusive right to use the registered mark in commerce on or in connection with the goods or services specified in the registrations: metal safes."  Mem. in Supp. of Mot. for Prelim. Inj., p. 9 (Docket No. 5, Att. 1).

KSC acknowledges as much, but points out that KSC "has been using the KODIAK mark on safes as well as using its Kodiak Trade Names prior to Rhino filing its application for

**REPORT AND RECOMMENDATION / DECISION AND ORDER - 27**

trademark." The history it has with the Kodiak name is dispositive in this dispute, according to

KSC, because:

> For over 30 years, [KSC] has continuously and extensively used the mark KODIAK on safes throughout California and in numerous states throughout the United States . . . .

> Evidence regarding [KSC's] use of the KODIAK mark includes representative sales of Kodiak safes to numerous counties in California and in other states, mailers and point-of-purchase flyers, billboard advertisements, dealer price sheets, social media posts, and solicitations from customers through [KSC's] Coming Soon website.

> In addition to [KSC's] use of the mark KODIAK, [KSC's] use of the Kodiak Trade Names, including Kodiak Safe Company, serves as grounds for cancellation of Rhino's mark. . . . [KSC's] trade name was registered with the state of California in 2012. The trade name Kodiak Safe Company has been used extensively by [KSC] and its predecessors since 1981. Evidence of use of the Kodiak Trade Names by [KSC] and/or its predecessors include, among other things, filing with the secretary of the state, the contract with a web developer using the trade name to create a website for [KSC], the exhibit display order for the World Ag Expo, and advertisements using the trade name.

> While, a Rhino claims, its registration is prima facie evidence of its exclusive right to use the registered mark in commerce on or in connection with the goods or services specified in the registration, it cannot stand in the face of substantial contrary evidence of prior use. This is true even if [KSC's] use was as limited as Rhino inaccurately claims it is, only in Fresno, California, which it is not.

Opp. to Mot. for Prelim. Inj., pp. 6-8 (Docket No. 12) (citing Tanney Decl. (Docket No. 13, Atts.

1 & 2)).

Rhino would have the Court reject KSC's allegations of prior use, claiming, first, that

they are neither supported by "concrete evidence," and, second, that at most, they only entitle

KSC to continue using its "Kodiak" brand within its actual trade territory as of the date of

Rhino's registration. *See* Mem. in Supp. of Mot. for Prelim. Inj., pp. 13-17 (Docket No. 5, Att.

1); *see also* Reply in Supp. of Mot. for Prelim. Inj., pp. 1-3 (Docket No. 19). Specifically,

Rhino argues that (1) the correspondence provided by KSC's attorneys leading up to this

**REPORT AND RECOMMENDATION / DECISION AND ORDER - 28**

litigation (KSC's archival internet presence, an alleged pre-July 25, 2014 (the date of Rhino's

trademark application) Better Business Bureau webpage, and an alleged Google® search for

"kodiak safes" showing results prior to July 25, 2014) fail to show any level of market

penetration specific to KSC's product during the relevant time period; (2) between 1981 and July

25, 2014, KSC identifies (without supporting documentation) a total of 25 sales of "Kodiak"

safes, "the epitome of small, sporadic, and inconsequential sales that do not constitute prior use

for trademark priority purposes; and (3) KSC's alleged advertising and marketing activities *after*

July 25, 2014 are immaterial when resolving the issue of KSC's claimed prior use.  *See* Mem. in

Supp. of Mot. for Prelim. Inj., pp. 14-15 (Docket No. 5, Att. 1); *see also* Reply in Supp. of Mot.

for Prelim. Inj., pp. 2-3 (Docket No. 19) (internal quotation marks and citations omitted).

On the second point, Rhino points to *Weiner King, Inc. v. Wiener King Corp.*, 615 F.2d

512 (C.C.P.A. 1980) and its progeny for the proposition that, even assuming KSC's prior use,

KSC would only be able to use its "Kodiak" brand within its actual trade territory – in essence,

what a preliminary injunction serves to provide in the first instance.  *See* Mem. in Supp. of Mot.

for Prelim. Inj., p. 16 (Docket No. 5, Att. 1) (citing *Weiner King*, 615 F.2d at 523) (United States

Courts of Customs and Patent Appeals granted priority to junior user/registrant, subject only to

senior user's prior use)); *but see* Opp. to Mot. for Prelim. Inj., p. 8 (Docket No. 12) (citing

McCarthy on Trademarks § 20:53 (4th ed. 2017) ("Under Lanham Act § 2(d), 15 U.S.C.A.

§ 1052(d), a cancellation petitioner's proof of prior use anywhere in the United States even in

*intrastate* commerce is sufficient to cancel registration of a conflicting mark even though

registrant may have been the first to engage in *interstate* commerce with the mark.  Thus, a

cancellation petitioner may prevail upon a showing of priority of use of a confusingly similar

term in any geographic area of the United States.") (emphasis in original)).

**REPORT AND RECOMMENDATION / DECISION AND ORDER - 29**

It is clear from all this that the ownership interest in the KODIAK mark is hotly contested.  And, at the very least, the respective arguments illustrate serious questions concerning whether Rhino owns the KODIAK mark by virtue of its registration, whether KSC has priority use of the KODIAK mark by virtue of its business enterprise dating back to 1981, and whether the cross-currents of such claims of ownership impact the geographic scope of either party's use of the same mark.

### ii.       Likelihood of Confusion

To prevail on its trademark infringement claim, Rhino must prove that KSC's "use of its mark is likely to cause consumer confusion."  *Dep't of Parks*, 448 F.3d at 1124.  Analysis of the "likelihood of confusion" is made under the so-called *Sleekcraft* test, an eight-factor test introduced in *AMF, Inc. v. Sleekcraft Boats*, 599 F.2d 341, 348-49 (9th Cir. 1979).  The *Sleekcraft* factors are:

- strength of the mark;

- proximity of the goods;

- similarity of the marks;

- evidence of actual confusion;

- marketing channels used;

- type of goods and the degree of care likely to be exercised by the purchaser;

- the defendant's intent in selecting the mark; and

- likelihood of expansion of the product lines.

*See id*.

The *Sleekcraft* factors are "not exhaustive."  *Network Automation, Inc. v. Advanced Sys. Concepts, Inc.*, 638 F.3d 1137, 1153 (9th Cir. 2011) (quoting *Sleekcraft*, 599 F.2d at 348, n.11).

**REPORT AND RECOMMENDATION / DECISION AND ORDER - 30**

Other factors may be taken into account and the test should not be applied mechanically. *See, e.g.*, *Network Automation*, 638 F.3d at 1145 ("[o]ther variables may come into play depending on the particular facts presented"); *Fortune Dynamic, Inc. v. Victoria's Secret Stores Brand Mgmt., Inc.*, 618 F.3d 1025, 1030 (9th Cir. 2010) ("This eight-factor analysis is 'pliant,' illustrative rather than exhaustive, and best understood as simply providing helpful guideposts."). Ultimately, the inquiry must focus on the factual question of whether consumers are likely to be confused.

Using a flexible approach in considering such factors, common sense suggests that when two companies in the business of manufacturing and selling metal safes (including the more specialized gun safe industry), use the same (or similar) KODIAK mark/branding in doing so, a likelihood of confusion is possible, if not probable. *See, e.g.*, Ex. L to McCurdy Decl. (Docket No. 5, Att. 5) (U.S. Patent & Trademark Office's August 5, 2015 rejection of KSC's April 23, 2015 trademark application "because of a *likelihood of confusion* with the mark in U.S. Registration No. 4740936 [(Rhino's Kodiak mark)] . . . . [T]he marks are *identical in terms of appearance and sound*. In addition, the connotation and commercial impression of the marks do not differ when considered in connection with applicant's and registrant's respective goods and/or services. *Therefore, the marks are confusingly similar*. . . . The goods travel in the same channels of trade because metal safes are identical and gun cabinets and metal safes travel in the same channels of trade. . . . [T]he goods and/or services . . ., namely metal safes and gun cabinets and gun safes, are of a kind that may emanate from a single source under a single mark.") (emphasis added); *see also* Tanney Decl., ¶ 14 (Docket No. 13) ("During the time that [KSC] had a "Coming Soon" page at <kodiaksafes.com>, before the current website was published, and on information and belief, after Rhino . . . began marketing and selling its brand of safes including the wording "Kodiak," *[KSC] began to receive indications that consumers were*

**REPORT AND RECOMMENDATION / DECISION AND ORDER - 31**

*beginning to be confused between [KSC] and Rhino . . .*”) (emphasis added); Suggs Decl., ¶ 13

(Docket No. 5, Att. 2) (“I was made aware of customer confusion between Rhino and KSC

products through an email chain between a member of our sales staff and a local retailer. . . .  A

customer had located a KSC safe on the internet and wanted to purchase that safe from the local

retailer.  *The retailer attempted to buy the safe from Rhino, and the customer was, as I*

*understand it, getting impatient with the confusion and delay.  The retailer continued to*

*reference a ‘Kodiak cub 20x20x30 safe’ that was available for purchase at*

*<www.kodiaksafes.com> while also contacting the Rhino sales representative about the*

*product*.”) (emphasis added).

        The Court is satisfied that Rhino has alleged facts, supported by the evidence in the

record, showing a likelihood of consumer confusion between both parties’ interest in the mark.

Though KSC may be correct that its prior use obviates the need to even consider the *Sleekcraft*

factors (*see* Opp. to Mot. for Prelim. Inj., p. 8 (Docket No. 12)), at this stage, Rhino has shown a

likelihood of success on its allegations – represented, in part, by serious questions going to the

ownership of a valid, protectable mark (*see supra*).

        b.      *Irreparable Harm*

        Before *Winter*, irreparable injury was often presumed in trademark cases where the mark-

holder demonstrated a likelihood of success on the merits.  *See Brookfield Commc’ns*, 174 F.3d

at 1066.  The Ninth Circuit has since rejected any such presumption, holding instead that a

plaintiff must show that a likelihood of irreparable harm absent an injunction.  *See Herb Reed*

*Enters., LLC v. Florida Entm’t Mgmt, Inc.*, 736 F.3d 1239, 1249 (9th Cir. 2013).  To make that

showing, the mark-holder must demonstrate that, without an injunction, it is likely to suffer

**REPORT AND RECOMMENDATION / DECISION AND ORDER - 32**

immediate harm that legal remedies cannot fix.  *See id*. at 1250.  Rhino has made that showing here.

Courts have consistently found that losing control over trademarks, and with them, control over business goodwill and reputation, constitutes irreparable injury, justifying injunctive relief.  *See, e.g.*, *id*. ("Evidence of loss of control over business reputation and damage to goodwill could constitute irreparable harm") (citations omitted); *CrossFit, Inc. v. Davalos*, 2017 WL 733213, *4 (N.D. Cal. 2017) ("Injunctive relief is the remedy of choice for trademark and unfair competition cases, since there is no adequate remedy at law for the injury caused by a defendant's continuing infringement. . . . As to the second factor, the adequacy of remedies at law, monetary damages are inadequate to compensate CrossFit for ongoing loss of customers and goodwill.") (internal quotation marks and citations omitted); *Athleta, Inc. v. Pitbull Clothing Co.*, 2013 WL 142877, *10 (C.D. 2013) ("Post-*Winter*, courts have repeatedly found that losing control of one's reputation and goodwill in the marketplace supports the issuance of an injunction."); *CytoSport, Inc. v. Vital Pharm., Inc.*, 617 F. Supp. 2d 1051, 1080 (E.D. Cal. 2009) ("Trademarks serve as the identity of their owners and in them resides the reputation and goodwill of their owners . . . .  A trademark owner's loss of the ability to control its marks, thus, creates the potential for damage to its reputation.  Potential damage to reputation constitutes irreparable injury for the purpose of granting a preliminary injunction in a trademark case.").

As stated above, the reality of consumer confusion surrounding the ownership of the KODIAK mark/brand inescapably compromises Rhino's present control over its business reputation, as well as customer goodwill and satisfaction.  This circumstance is heightened even further by KSC's attempted business expansion beyond the Fresno, California area and into national gun safe markets through its more interactive website and the entry into internet

marketplaces such as Amazon.com.  The damages that would flow from such changes to Rhino's

business presence cannot be precisely quantified and, therefore, impossible to adequately

compensate monetarily after-the-fact:

> Even though defendant may have the resources to be able to pay damages after a
> trial, the difficulties of proof of compensatory damages where a good name and
> reputation are involved can result in a holding that "irreparable damage" is accruing.
> . . . .
>
> "Where there is, then, such high probability of confusion, injury irreparable in the
> sense that it may not be fully compensable in damages almost inevitably follows.
> While an injured plaintiff would be entitled to recovery the profits on the infringing
> items, this is often difficult to determine; moreover, a defendant may have failed to
> earn profits because of the poor quality of its product or its own inefficiency.  Indeed,
> confusion may cause purchasers to refrain from buying either product and to turn to
> those of other competitors.  Yet to prove the loss of sales due to infringement is also
> notoriously difficult. . . .  Furthermore, if an infringer's product is of poor quality,
> or simply not worth the price, a more lasting, but not readily measurable injury may
> be inflicted on the plaintiff's reputation in the market."

5 McCarthy on Trademarks and Unfair Competition § 30:47 (4th ed. 2017) (quoting *Omega*

*Importing Corp. v. Petri-Kine Camera Co.*, 451 F.2d 1190, 1195 (2nd Cir. 1971)).  *See also id.* at

§ 30:46 ("If it is likely that confused persons will mistakenly attribute to plaintiff defects or

negative impressions they have of defendant's goods or services, then the plaintiff's reputation

(and its signifying trademark) is at risk because it is in the hands of a stranger.  This kind of

injury is difficult, if not impossible, to adequately compensate for after the fact of injury."); *id.* at

§ 30:2 (same).

 In short, Rhino credibly contends that its reputation and goodwill in the marketplace has

suffered and will continue to suffer as a result of ongoing consumer confusion orbiting its and

KSC's products.  Because these impacts cannot be quantified, Rhino will suffer irreparable harm

in the event a preliminary injunction is not issued.[5]

---

 [5]  The undersigned also disagrees with KSC that Rhino delayed in moving for a
preliminary injunction, cutting against its claim of irreparable injury.  *See* Opp. to Mot. for

**REPORT AND RECOMMENDATION / DECISION AND ORDER - 34**

    c.    *Balance of Equities*

 "In each case, a court must balance the competing claims of injury and must consider the effect on each party of granting or withholding the requested relief." *Amoco Prod. Co. v. Vill. of Gambell, Alaska*, 480 U.S. 531, 542 (1987). In making that assessment, the Court concludes from the record that Rhino appears to have a commercially successful product in its Kodiak line of gun safes – selling over 9,400 gun safes across the country with the KODIAK mark. According to Rhino, the requested preliminary injunction aims to protect and safeguard Rhino's established brand and related KODIAK mark from the likelihood of irreparable harm caused by KSC's alleged infringement and latest foray into a larger, nationwide mark via its interactive website and virtual clearinghouses. In contrast, KSC is a smaller manufacturer and seller with a market generally limited to the southern California area.

 Rhino will most assuredly be impacted in the event a preliminary injunction is not entered; conversely, KSC will be impacted in the event a preliminary injunction is entered. The

---

Prelim. Inj., pp. 9-10 (Docket No. 12). A plaintiff may not be able to bring suit until a defendant's progressive encroachment became actionable trademark infringement, once a plaintiff became aware of significant evidence of actual and likely confusion. *See Grupo Gigante SA De CV v. Dallo & Co., Inc.*, 391 F.3d 1088, 1103 (9th Cir. 2004); *see also Nat'l Customer Eng'g, Inc. v. Lockheed martin Corp.*, 43 U.S.P.Q.2d 1036, 1040 (C.D. Cal. 1997) (finding that delay "is not measured from a defendant's first use of the contested mark, but from the date that defendant began significantly impacting plaintiff's goodwill and business reputation"). On the other hand, "the plaintiff cannot simply wait without explanation to see how successful the defendant's business will be and then ask for an injunction to take away good will developed by defendant in the interim." *Grupo Gigante*, 391 F.3d at 1102-03. To be clear, it was the state of KSC's website in August 2015 that first set in motion the potential need for a preliminary injunction. Rhino's ultimate initiation of this action in this Court in June 2016 (preceded by it filing an action in Utah federal court in May 2016), followed soon thereafter by the at-issue Motion for Preliminary Injunction, does not represent the sort of delay that would call into question Rhino's claimed irreparable harm, especially considering the parties' discussions of the pertinent issues in the meantime and Rhino's related investigation. *See, e.g.*, Exs. M & N to McCurdy Decl. (Docket No. 5, Att. 5).

**REPORT AND RECOMMENDATION / DECISION AND ORDER - 35**

nature and degree of such impacts is the kettle of fish the Court must consider and after

balancing these impacts, the undersigned finds that the hardship to Rhino if an injunction is not

entered outweighs the hardship to KSC in having to comply with one.  Preserving the status quo

will not disproportionately impact KSC's ability to conduct its business operations in much the

same way it has historically pursued, while still protecting Rhino from KSC's more recent,

nationwide marketing of an allegedly infringing product.  In short the preliminary injunction

places the parties in a position of reasonably close verisimilitude to the positions they were in

immediately prior to the date of KSC's alleged trademark infringement.

>              d.    *Public Interest*

"The public interest analysis for the issuance of [injunctive relief] requires [district

courts] to consider whether there exists some critical public interest that would be injured by the

grant of preliminary relief."  *Alliance for the Wild Rockies*, 632 F.3d at 1138.  "In the trademark

context, the public interest is usually the right of the public not to be deceived or confused."

*Century 21 Real Estate LLC v. All Professional Realty, Inc.*, 2011 WL 221651, *13 (E.D. Cal.

2011) (citing *Internet Specialities West, Inc. v. Milon-DiGiorgio Enters., Inc.*, 559 F.3d 985,

993-94 (9th Cir. 2009); *CytoSport*, 617 F. Supp. 2d at 1090; *Moroccanoil, Inc. v. Moroccan Gold,

LLC*, 590 F. Supp. 2d 1271, 1282 (C.D. Cal. 2008)).

Here, a preliminary injunction would serve the public interest of supporting trademark

rights and avoiding consumer confusion.  *See Las Vegas Sands Corp. v. Li*, 2016 WL 7007545,

*6 (D. Nev. 2016) (Public interest favors "upholding property interests in trademarks and

preventing customer confusion."); *Warner Bros. Entm't, Inc. v. The Global Asylum, Inc.*, 2012

WL 6951315, *23 (C.D. Cal. 2012) ("In trademark cases, the public interest is the public's right

**REPORT AND RECOMMENDATION / DECISION AND ORDER - 36**

not to be deceived or confused."). Where there is a likelihood of significant consumer confusion in distinguishing between Rhino's registered mark and KSC's allegedly infringing mark/brand, the undersigned finds that there is a public interest in granting the preliminary injunction.[6]

Rhino has shown that there are serious questions upon the merits and that the balance of hardships tips in its favor. Rhino has also shown that it is likely to suffer irreparable harm and the public interest favors a preliminary injunction in this instance. Accordingly, Rhino is entitled to a preliminary injunction under Ninth Circuit law. It is therefore recommended that Rhino's Motion for Preliminary Injunction (Docket No. 5) be granted.

3.     Proper Scope of Injunctive Relief

Rhino specifically requests that the Court enter a preliminary injunction "enjoining KSC from selling, offering to sell, marketing, or advertising gun safes in any geographic region outside of the city of Fresno, California, including all Internet advertising directed at consumers

---

[6] KSC argues that a "substantial bond" is necessary if the Court imposes the requested injunction. *See* Opp. to Mot. for Prelim. Inj., pp. 15 (Docket No. 12). Under FRCP 65(c), "[t]he court may issue a preliminary injunction . . . only if the movant gives security in an amount that the court considers proper to pay the costs and damages sustained by any party found to have been wrongfully enjoined or restrained." Fed. R. Civ. P. 65(c). The Ninth Circuit has recognized that FRCP 65 "invests the court with discretion as to the amount of security required, *if any*." *Jorgensen v. Cassiday*, 320 F.3d 906, 919 (9th Cir. 2003) (emphasis in original) (quoting *Barahona-Gomez v. Reno*, 167 F.3d 1228, 1237 (9th Cir. 1999)). Thus, the purpose of the bond is to safeguard a defendant if the Court later determines that a defendant has been wrongfully enjoined. *See Moroccanoil, Inc. v. Zotos Int'l, Inc.*, 2017 WL 319309, *10 (C.D. Cal. 2017). On this issue, Rhino "is not opposed to the imposition of a bond," but argues that, in the absence of KSC's sales figures and, corresponding, "any showing by KSC of what a proper bond amount would be," the bond amount should be $5,000 or less. Reply in Supp. of Mot. for Prelim. Inj., p. 9 (Docket No. 19) (citing *Teton Cty. Republican Cent. Comm. v. Hansen*, 2016 WL 1574028, *10 (D. Idaho 2016) ("Absent any showing by Defendant of cost, and considering the strong public interest in this matter, the Court determines a nominal bond of $5,000 is appropriate.")). Under the circumstances (namely, that a bond is appropriate, but that no showing has been made as to the proper amount), the undersigned recommends that a bond of $10,000 be imposed, unless/until KSC is capable of justifying a higher bond amount.

**REPORT AND RECOMMENDATION / DECISION AND ORDER - 37**

outside of Fresno, California." Mem. in Supp. of Mot. for Prelim. Inj., pp. 4 & 20 (Docket No. 5, Att. 1). The scope of Rhino's proposed injunction is overly broad.

Preliminary injunctions are designed to maintain the status quo as of the "last uncontested status which preceded the pending controversy." In that legal frame, it would be unjust to altogether prohibit KSC from selling, marketing, or advertising gun safes beyond Fresno, California. Though the record is scant on the issue, it appears that prior to July 25, 2014 (the date of Rhino's trademark application), KSC was marketing and selling its products beyond, simply, Fresno, California. *See* Opp. to Mot. for Prelim. Inj., pp. 13-14 (Docket No. 12). At that time, KSC had a "Coming Soon!" website, albeit with decreased functionality and no interactivity; KSC maintained a phone book listing, distributed outside of Fresno, California; KSC rented booth displays at trade shows (e.g., World Ag Expo) in Tulare County. *See id*. Additionally, KSC apparently sells multiple "brands of safes" that do not use the KODIAK mark (e.g., the BLACK BEAR™ brand, and the CUB™ brand).

Therefore, the exact contours of an appropriate preliminary injunction cannot be drawn from the parties' briefing to date.[7] Accordingly, consistent with the undersigned's recommendation that a preliminary injunction be entered in the first instance, it is additionally recommended that the parties meet, confer, and attempt to stipulate to proposed language contained within any such preliminary injunction in the event the recommendation that a preliminary injunction be entered is ultimately adopted by Judge Lodge. If no stipulation is

---

[7] Rhino's reply brief references an "amended proposed preliminary injunction," however the undersigned is unable to locate it in the record. *See* Reply in Supp. of Mot. for Prelim. Inj., p. 1 (Docket no. 19). Moreover, at oral argument, Rhino's counsel indicated that the amended proposed preliminary injunction was submitted to Judge Lodge's chambers.

**REPORT AND RECOMMENDATION / DECISION AND ORDER - 38**

reached, the parties shall include their respective positions on the issue as part of their briefing following the undersigned's recommendations for Judge Lodge's consideration.

**C.     Rhino's Motion for Leave to File Under Seal (Docket No. 31)**

Rhino seeks to file under seal two exhibits submitted in support of its supplemental briefing relating to KSC's Motion to Dismiss – Exhibits Q and U.  *See* Mot. for Leave to File Under Seal (Docket No. 31).  Rhino does not believe that there is a basis to file these exhibits under seal, however they contain information that KSC designated as "Confidential" or "Highly Confidential – Attorney's Eyes Only" under the Interim Protective Order (Docket No. 30).  *See* Mem. in Supp. of Mot. for Leave to File Under Seal, p. 2 (Docket No. 31, Att. 1).

On December 1, 2016, Rhino contested these designations pursuant to Paragraph 8 of the Interim Protective Order.  *See id*.  Under that same paragraph, KSC had 14 days thereafter to file a motion seeking to substantiate its designation with the Court.  To date, however, KSC filed no such motion.  Rhino therefore filed its Motion for Leave to File Under Seal in an abundance of caution, awaiting either a motion from KSC justifying the need to file these materials under seal, or until the Court rules on the Motion.[8]

Absent argument from KSC, there is no obvious basis to seal either Exhibits Q or U. Therefore, Rhino's Motion for Leave to File Under Seal (Docket No. 31) is conditionally denied. KSC may submit a motion to seal Exhibits Q and/or U within 14 days of this Report and Recommendation/Memorandum Decision and Order.  If no such motion is filed during this time, Exhibits Q and U shall be immediately unsealed.  If such a motion is filed during this time, Exhibits Q and U shall remain sealed until further order of the Court.

---

[8]  Rhino was forced to file the Motion to Seal, given that its supplemental briefing relating to KSC's Motion to Dismiss was filed on December 7, 2016, before KSC's deadline for filing any motion supporting its designations.

**REPORT AND RECOMMENDATION / DECISION AND ORDER - 39**

## III.  RECOMMENDATION / ORDER

Based on the foregoing, IT IS HEREBY RECOMMENDED that:

1.       KSC's Motion to Dismiss (Docket No. 6) BE DENIED; and

2.       Rhino's Motion for Preliminary Injunction (Docket No. 5) be GRANTED.

Pursuant to District of Idaho Local Civil Rule 72.1(b)(2), a party objecting to a Magistrate Judge's recommended disposition "must serve and file specific, written objections, not to exceed twenty pages . . . within fourteen (14) days. . ., unless the magistrate or district judge sets a different time period."  Additionally, the other party "may serve and file a response, not to exceed ten pages, to another party's objections within fourteen (14) days after being served with a copy thereof."

Additionally, based on the foregoing, IT IS HEREBY ORDERED that Rhino's Motion for Leave to File Under Seal (Docket No. 31) is CONDITIONALLY DENIED.

KSC may submit a motion to seal Exhibits Q and/or U within 14 days of this Report and Recommendation/Memorandum Decision and Order.  If no such motion is filed during this time, Exhibits Q and U shall be immediately unsealed.  If such a motion is filed during this time, Exhibits Q and U shall remain sealed until further order of the Court.

DATED:  **March 25, 2017**

Honorable Ronald E. Bush
Chief U. S. Magistrate Judge